UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

LARRY THOMAS,                              :

              Plaintiff,      :        **REPORT AND**
                              **RECOMMENDATION**
      -v-

                          :        09 Civ. 5209 (LTS)(MHD)

Mrs. A.E. CALERO,                          :
Sgt. M. BERRY,
CO FRANCISCO CARABALLO,                     :
CO RODNEY LASSITER, and
DIRECTOR NORMAN R. BEZIO                     :

           Defendants.       :
------------------------------------x

**TO THE HONORABLE LAURA T. SWAIN, U.S.D.J.:**

    Plaintiff Larry Thomas, an inmate in the New York State

correctional system, commenced this pro se section 1983 action

against five employees of the Department of Correctional Services

("DOCS"). He alleges that three of the defendants -- Correctional

Sergeant ("Sgt.") M. Berry, Corrections Officer ("CO") Francisco

Caraballo[1] and CO Rodney Lassiter -- filed false misbehavior

reports and provided false testimony at a disciplinary hearing,

which caused plaintiff to spend 291 days in the Special Housing

Unit ("SHU"). In addition, Mr. Thomas alleges that defendant A.E.

Calero, a Civilian Hearing Officer ("CHO"), denied him the right to

---

[1] Plaintiff named a "Correctional Officer, Careballo" in the
complaint. (See Compl. at 1). It appears, however, that this
defendant's actual name is Correctional Officer Francisco
Caraballo. (See Answer at ¶ 1).

call two witnesses -- Sgt. Kasper and CO Smith -- at his disciplinary hearing, resulting in a deprivation of his right to procedural due process.[2] Plaintiff further alleges that Norman Bezio, the Director of Special Housing/Inmate Disciplinary Programs failed to correct this error when he affirmed CHO Calero's findings, with only a modification of the sentence. (Compl. Addendum at 6-7).[3] Plaintiff seeks compensatory and punitive damages from the defendants.

In responding to the complaint, defendants have moved to dismiss under Rule 12(b)(6). In support of their motion, defendants assert that, insofar as plaintiff sues them in their official capacities, the claims are barred by the Eleventh Amendment. (Defs.' Mem. of Law at 8). Defendants also assert that plaintiff's

---

[2] At times plaintiff makes reference to "CO White" as the officer, in addition to Sgt. Kasper, whom plaintiff sought to call at his hearing. (See, e.g., Compl. Addendum at 6; Pl.'s Opp. to Mot. to Dismiss at 1). It appears, however, that this was an error and the two additional officers whom plaintiff actually wished to call as witness were Sgt. Kasper and CO Smith.

[3] Citations to "Compl." refer to the official court document section of Mr. Thomas' complaint -- a seven-page numbered questionnaire for pro se plaintiffs, in which Mr. Thomas provided basic information about his claims. Citations to "Compl. Addendum" refer to the lined sheets of paper attached to this form which Mr. Thomas inserted between the second and third pages of the questionnaire and in which Mr. Thomas elaborated on the factual and legal basis for his claims. Pages within "Compl. Addendum" are numbered 3 through 7.

allegations that Sgt. Berry, CO Lassiter and CO Caraballo filed false charges and testified falsely do not state a cognizable due-process claim. (Id. at 8-9). Additionally, they argue that CHO Calero is protected by a qualified-immunity defense from liability on plaintiff's claim that she violated his right to due process by not calling two corrections officers as witnesses for plaintiff. (Id. at 9-17). Finally, defendants assert that plaintiff has no viable claim against Director Bezio. (Id. at 17-18).

For the reasons that follow, we recommend that defendants' motion be granted in part and denied in part.

## Plaintiff's Allegations

In plaintiff's complaint he provides a detailed chronology of the events that resulted in his confinement in SHU. We summarize that history here.

On the morning of January 29th, 2008, Sgt. Berry and non-defendant Sgt. Kasper entered plaintiff's cell at Sing Sing Correctional Facility. (Compl. Addendum at p. 3, ¶ 1). Sgt. Berry woke plaintiff and directed him to step out of his cell. (Id.). Sgt. Berry then directed CO Caraballo to pat-frisk plaintiff.

3

(Id.). The frisk yielded a rolled-up cigarette in plaintiff's left pants pocket which, plaintiff alleges, was falsely claimed to be marijuana. (Id.). CO Caraballo also claimed to have found a cellophane bag (also referred to as "a latex finger") full of marijuana in plaintiff's sock. (Id.). Sgt. Berry then directed CO Caraballo to strip-search plaintiff, and CO Caraballo complied. (Id.). Following the strip search, Sgt. Kasper requested that plaintiff provide a urine sample. (Id.). Plaintiff complied with Sgt. Kasper's request and was taken to SHU. (Id.). Sgt. Berry instructed CO Lassiter to search plaintiff's cell. CO Lassiter's search allegedly uncovered an AM/FM radio in plaintiff's cell desk drawer, and a search of the radio yielded a concealed and unauthorized razor. (Id.).

On January 30th, 2008, plaintiff was given two misbehavior reports, which were consolidated into one proceeding. (Id. at ¶ 2). The first report, by CO Caraballo, charged plaintiff with possession of marijuana and unauthorized smoking. (Id.). The second report, by CO Lassiter, charged plaintiff with possession of a weapon, possession of contraband and destruction of State property. (Id.). On January 31, 2008, plaintiff was given a third misbehavior report, charging him with drug use, supposedly because the urine test ordered by Sgt. Kasper was positive for the presence of drugs.

4

(Id. at ¶ 3; Defs.' Mem. of Law at 3).

On February 10, 2008, plaintiff pled guilty to drug use. He received a final disposition of 60 days SHU confinement and 60 days loss of telephone privileges. (Compl. Addendum at pp. 3-4, ¶ 4).

On February 20, 2008, CHO Calero began a hearing on the charges of contraband marijuana, unauthorized smoking, possession of a weapon, possession of contraband and destruction of State property. (Id. at p 4, ¶ 5). Plaintiff asserts that the charges were never read into the record, but he does not claim that he was unaware of them. (Id.). Plaintiff pled not guilty to all charges. (Id.). At his hearing plaintiff requested that Sgt. Berry, Sgt. Kasper, CO Caraballo, CO Lassiter and CO Smith be called as witnesses. CHO Calero granted plaintiff's request to call Sgt. Berry, CO Caraballo and CO Lassiter as witnesses. (Id.). Plaintiff and CHO Calero also had a discussion about calling Sgt. Kasper and CO Smith as witnesses, but CHO Calero ultimately denied plaintiff's request to call CO Smith as a witness and reserved decision on whether to call Sgt. Kasper. (Id.).

Sgt. Berry testified by speaker phone from another facility on February 22, 2008. (Id. at ¶ 6). He recounted that Sgt. Kasper had

5

not been with him at plaintiff's cell during the search, but had been somewhere in the area. (Id.). Sgt. Berry stated that he had seen smoke coming from plaintiff's cell but had not observed plaintiff smoking. (Id.). However, he did notice a mirror positioned on the gate of plaintiff's cell, presumably to allow plaintiff to see approaching DOCS staff. (Id.). Sgt. Berry also testified to observing CO Caraballo pull a marijuana cigarette from plaintiff's pocket and a latex finger full of marijuana from plaintiff's sock. (Id.). Plaintiff contends that CHO Calero cut short his inquiry about Sgt. Berry going into his cell. (Id. ("When I attempted to question him about going into my cell C.H.O. Calero cut me off.")).

On February 25, 2008, CO Caraballo testified. (Id. at ¶ 7). Plaintiff states that CO Caraballo offered testimony that he had seen smoke coming out of plaintiff's cell but that he had not seen plaintiff smoking. (Id.). CO Caraballo also testified that Sgt. Berry had instructed CO Lassiter to open plaintiff's cell and that he (CO Caraballo) had found a marijuana cigarette in plaintiff's pocket and a latex finger full of marijuana in plaintiff's sock. (Id.). Plaintiff contends that at this time he renewed his request to call Sgt. Kasper as a witness, but CHO Calero denied his request. (Id.).

6

CO Lassiter testified on March 10, 2008. (Id. at p. 5, ¶ 8). Plaintiff claims that CO Lassiter testified to finding an AM/FM radio in plaintiff's cell desk drawer and that he did not believe that anyone would have been able to reach his hand into the cell to plant the radio in the drawer. (Id.). This radio allegedly contained an unauthorized razor. (Compl. Ex. B at 2). CO Lassiter further testified that he had not opened plaintiff's cell, nor did he know who had opened the cell, but that he had searched the cell. (Compl. Addendum at p. 5, ¶ 8).

CHO Calero found plaintiff guilty of possession of contraband marijuana (Rule 113.23), smoking indoors (Rule 122.10), weapon possession (Rule 113.10) and contraband possession (Rule 113.23). (Compl. Addendum at p. 5, ¶ 8). Plaintiff received a sentence of 22 months in SHU plus loss of privileges, with four (4) months suspended and six (6) months deferred, plus 24 months loss of good time. (Id.).

Shortly thereafter plaintiff filed an administrative appeal.[4] (Id.). As a result of plaintiff's appeal, on April 24, 2008, Director Bezio concluded that "THE MISBEHAVIOR, ALTHOUGH SERIOUS,

---

[4] The grounds for this appeal are not included in the record.

DOES NOT WARRANT THE PENALTY IMPOSED." (Compl. Ex. A). Accordingly, he modified the final disposition, reducing all sanctions to 12 months. (Compl. Addendum at p. 5, ¶ 9; Compl. Ex. A)

On May 5, 2008, plaintiff filed an Article 78 proceeding in New York State Supreme Court, Albany County, to challenge his disciplinary conviction and the imposed sentence. (Compl. Addendum at p.5, ¶ 9; Compl. Ex. B). In the proceeding Thomas challenged CHO Calero's denial of two witnesses, identified as COs Kasper and Smith. (Compl. Ex. B). He also argued that the hearing was untimely and that the search of his cell, which had uncovered marijuana and a concealed razor, was unlawful. (Id.).

On January 9, 2009, the state court vacated the disciplinary conviction and ordered DOCS to conduct a de novo hearing before a new hearing officer. (Compl. Addendum at p. 5, ¶ 11; Compl. Ex. B). In doing so the judge held that the CHO had violated plaintiff's right to have the two officers called to testify. Explaining this ruling, the court invoked 7 N.Y.C.R.R. § 254.5, which provides that an inmate may call a witness if his "testimony is material, is not redundant, and doing so does not jeopardize institutional safety or corrections goals." (Compl. Ex. B at 3). The court stated that this "conditional right to call witnesses is a constitutional right and

8

respondent's violation of their own regulations can be seen as a violation of petitioner's constitutional rights . . . ." (Id.). On review of the hearing transcript, the judge noted that although CHO Calero had denied plaintiff's request to call Sgt. Kasper as "redundant," Thomas had indicated that he had told the CHO that Sgt. Kasper was not present at the search of his cell and therefore could not have smelled smoke, which was the proposed basis of the uranalysis test requested by Sgt. Kasper. (Id.). As for CO Smith, the court observed that there was no proffered explanation in the record for his exclusion. (Id. at 4). Noting as well that the CHO had failed to provide a written explanation for the exclusion of Sgt. Kasper, the court remanded for a new hearing. (Id.).

On January 15, 2009, plaintiff was released from SHU and transferred to general population at Auburn Correctional Facility. (Compl. Addendum at p. 5, ¶ 2). By that time plaintiff had served 291 days in SHU. (Id.).

Pursuant to the state court's order, defendant Bezio directed that plaintiff be provided with a new hearing within 14 days. (Id. at p. 6, ¶ 13). There is no indication, however, that such a hearing ever took place.

9

## ANALYSIS

We assess defendants' proffered grounds for dismissal seriatim. Before doing so, we briefly review the standards applicable to a Rule 12(b)(6) motion.

### I.   Rule 12(b)(6) Criteria

On a motion to dismiss for failure to state a claim, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord, e.g., Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir. 2006) (internal citation omitted). In assessing such a motion, the court must assume the truth of the well-pled factual allegations of the complaint and must draw all reasonable inferences against the movant. E.g., Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 337 (2d Cir. 2006); Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996). The pleader may not rely, however, on allegations that are only bare legal conclusions, see Starr v. Sony BMG Music Entm't, 592 F.3d 314, 317 n.1 (2d Cir. 2010) (discussing Rule 8(a)) (quoting Ashcroft v. Iqbal, 129 S. Ct.

1937, 1949-50 (2009)), or "legal conclusions couched as factual allegations". <u>Starr</u>, 592 F.3d at 321 (quoting <u>Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007)).

The traditional test on a Rule 12(b)(6) motion required that the complaint not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Leibowitz v. Cornell Univ.</u>, 445 F.3d 586, 590 (2d Cir. 2006) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). The Supreme Court has recently rejected this formulation, however, and a complaint is now subject to dismissal unless its well-pled factual allegations, if credited, make the claim "plausible". <u>See Iqbal</u>, 129 S. Ct. at 1949; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 560-61 (2007). While the Supreme Court's recent decisions do not require a party to plead "detailed factual allegations" to survive a motion to dismiss, they do require that the plaintiff plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged". <u>Starr</u>, 592 F.3d at 321 (quoting <u>Iqbal</u>, 129 S. Ct. at 1949). In any event, "an unadorned, the-defendant-unlawfully-harmed-me accusation" will not suffice. <u>Iqbal</u>, 129 S. Ct. at 1949. In short, the pleading must do more than "tender[]

11

naked assertions devoid of further factual enhancement", <u>id.</u> (internal quotation marks omitted), and in doing so must "'raise a right to relief above the speculative level.'" <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (quoting <u>Twombly</u>, 550 U.S. at 555).

When addressing a 12(b)(6) motion, the court may not consider evidence proffered by the moving party or its opponent. <u>E.g.</u>, <u>Roth v. Jennings</u>, 489 F.3d 499, 509 (2d Cir. 2007); <u>Healthcare Fin. Group, Inc. v. Bank Leumi USA</u>, 669 F. Supp. 2d 344, 347 (S.D.N.Y. 2009) (internal citation omitted). Rather, the court is limited to reviewing the four corners of the complaint, any documents attached to that pleading or incorporated in it by reference, any documents that are "integral" to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice. <u>See</u>, <u>e.g.</u>, <u>ATSI Commc'ns, Inc.</u>, 493 F.3d at 98; <u>Roth</u>, 489 F.3d at 509; <u>Leonard F. v. Israel Disc. Bank</u>, 199 F.3d 99, 107 (2d Cir. 1999).

In view of plaintiff's status as an untutored <u>pro se</u> litigant, we read his complaint and motion papers liberally and derive from them the most reasonable claims and arguments that they may be read to imply. <u>See</u>, <u>e.g.</u>, <u>Triestman</u>, 470 F.3d at 474-76. Moreover, the

12

liberal pleading rules apply "with particularly stringency to [pro se] complaints of civil rights violations." Phillip v. Univ. of Rochester, 316 F.3d 291, 293-94 (2d Cir. 2003). However, the "plausibility" standard articulated in Twombly and Iqbal applies to the pleadings of pro se plaintiffs as well as to those of represented litigants. See, e.g., Carvel v. Cuomo, 357 Fed. App'x 382, 383-84 (2d Cir. Dec. 21, 2009); Sheehy v. Brown, 335 Fed. App'x 102, 104 (2d Cir. June 23, 2009); Collins v. West Hartford Police Dep't, 324 Fed. App'x 137, 138 (2d Cir. May 12, 2009); Dorsey v. Fisher, 2009 WL 4985421, *2, *4 (N.D.N.Y. Dec. 15, 2009); Conseillant v. Lafontant, 2009 WL 2163263, *1 (N.D.N.Y. July 20, 2009).

## II.   Defendants' Motion to Dismiss

### A.    The Purported Official-Capacity Claims

In plaintiff's complaint, under the heading "Cause[s] of Action", he alleges that the various defendants acted "in their official and individual capacity". (See Compl. Addendum at p. 6). Defendants assume that this allegation amounts to an assertion of claims against defendants in their official capacities, and they seek dismissal of these claims under the Eleventh Amendment. We do

not read these allegations as seeking to state claims for damages against defendants in their official capacity, although, if plaintiff intended to make such claims -- as defendants believe -- those claims would fail. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 70-71 (1989) (suit against state official in his official capacity is, in reality, suit against official's office and thus is no different from suit against State itself). A State's sovereign immunity is not abrogated by 42 U.S.C. § 1983. Id.

Defendant's argument, premised on the assumption that plaintiff is suing the named individual defendants in their official capacities, is factually inaccurate and, in part, irrelevant. We address defendants' analytical errors in this respect only briefly.

The Eleventh Amendment bars suits for money damages against a state or its agencies under section 1983. Moreover, a claim for damages asserted against a state employee in his "official capacity" is also deemed to be a claim against the state and hence barred by Eleventh Amendment immunity. See Kentucky v. Graham, 473 U.S. 159, 169 (1985); Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100-102 (1984). If, however, the plaintiff asserts a

14

claim for damages against a state employee in his individual capacity, it is not subject to such an immunity defense. See, e.g., Hafer v. Melo, 502 U.S. 21, 27-31 (1991). A claim for damages against a state, county or municipal employee will be viewed as one asserted against him in his individual capacity if it is the plaintiff's intent -- as manifested in the pleading or otherwise -- to seek the relief directly from that individual rather than from the employing government or agency. See, e.g., Davis v. New York, 316 F.3d 93, 102 (2d Cir. 2002) (citing Hafer, 502 U.S. at 27-31); Huang v. Johnson, 251 F.3d 65, 70 (2d Cir. 2001); Rodriguez v. Phillips, 66 F.3d 470, 482 (2d Cir. 1995); accord, e.g., Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001).[5]

We do not read plaintiff's allegations as defendants suggest, since they appear to be intended to plead that the individual defendants were acting under color of state law, a pleading requirement for stating a claim under section 1983. To assert a claim against a government employee under section 1983, the plaintiff must allege (and ultimately prove) that the defendant was

---

[5] The fact that the state may decide to indemnify the individual defendant if he is found liable does not alter this analysis or change a claim's status from one of individual-capacity to official-capacity. See, e.g., Huang, 251 F.3d at 70 (citing Farid v. Smith, 850 F.2d 917, 923 (2d Cir. 1988)).

acting "under color of state law," that is, that he was exercising in some way the power of his office. <u>Graham</u>, 473 U.S. at 166 (citing <u>Monroe v. Pape</u>, 365 U.S. 167 (1961)). Necessarily, then, to state such a claim the plaintiff must in fact allege action by the individual defendant as a government employee or official. <u>See</u>, <u>e.g.</u>, <u>id.</u>; <u>Johnson v. Goord</u>, 445 F.3d 532, 534 (2d Cir. 2006). If a claim against a state employee based on such conduct by him were barred by the Eleventh Amendment, then no claims could ever be asserted for constitutional torts by state representatives. That is of course not the law. Since plaintiff alleges only that the defendants were acting in their official capacity, his pleading does not justify invocation of the Eleventh Amendment.


   B. <u>The False-Misbehavior-Report Claims</u>


   Plaintiff claims that Sgt. Berry, CO Caraballo and CO Lassiter authored false misbehavior reports and gave false testimony at plaintiff's disciplinary hearing before CHO Calero. (<u>See</u> Compl. Addendum at p. 6, ¶ 1). The Second Circuit has long held, however, that a prison inmate has no constitutional right to be free from being falsely accused in a misbehavior report. <u>See</u>, <u>e.g.</u>, <u>Boddie v. Schnieder</u>, 105 F.3d 857, 862 (2d Cir. 1997). As explained by the Court of Appeals,

16

> [t]he prison inmate has no constitutionally guaranteed
> immunity from being falsely or wrongly accused of conduct
> which may result in the deprivation of a protected
> liberty interest. The plaintiff, as all other prison
> inmates, has the right not to be deprived of a protected
> liberty interest without due process of law.

Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986), reh'g denied,
826 F.2d 194 (2d Cir. 1987). This principle extends as well to
false testimony by corrections personnel at prison disciplinary
hearings. See Mitchell v. Senkowski, 158 Fed.Appx. 346, 349 (2d
Cir. 2005) ("The . . . provision of false testimony against an
inmate by corrections officers . . . violates due process only
where either procedural protections were denied that would have
allowed the inmate to expose the falsity of the evidence against
him . . . or where the fabrication of evidence was motivated by a
desire to retaliate for the inmate's exercise of his substantive
constitutional rights.") (internal citations omitted); cf. Briscoe
v. LaHue, 460 U.S. 325, 326 (1983) (affirming lower court's
conclusion that witnesses, including "government officials who
testify about the performance of their official duties," "are
absolutely immune from damages liability [under § 1983] based on
their testimony[.]").


The filing of a false misbehavior report may be actionable if
made in retaliation for an inmate's exercise of his constitutional

17

rights. See Boddie, 105 F.3d at 862. In the present case, however, plaintiff does not allege that defendants' conduct was a retaliatory response to plaintiff's exercise of any protected rights. See, e.g., Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004).

Accordingly, we recommend that the claims against Sgt. Berry, CO Caraballo and CO Lassiter, for false reporting and false testimony, be dismissed.

### C.   The Due-Process Claim Against CHO Calero

Plaintiff alleges that CHO Calero denied him due process by failing to call Sgt. Kasper and CO Smith as witnesses at plaintiff's disciplinary hearing. (Compl. Addendum at p. 6, ¶ 2). Defendants counter that the doctrine of qualified immunity should apply to shield CHO Calero from liability. (Defs.' Mem. of Law at 9-13). The doctrine of qualified immunity serves to protect public officials from liability in section 1983 actions insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818; see also Purnell v. Lord, 952 F.2d

18

679, 683-84 (2d Cir. 1992). The doctrine applies an objective standard to actions of government officials arising from performance of their discretionary functions. Harlow, 457 U.S. at 818.

Before looking to defendant's qualified-immunity defense, however, the court must usually first determine whether the plaintiff has alleged sufficient facts to support a finding that the defendant violated the plaintiff's constitutional rights. See, e.g., Saucier v. Katz, 533 U.S. 194, 201 (2001); Palmer v. Richards, 364 F.3d 60, 64 (2d Cir. 2004). We believe such facts have been alleged.

Plaintiff claims that CHO Calero deprived him of his due-process rights during his disciplinary hearing. (Compl. Addendum at 6). To establish this claim, plaintiff must show: '"(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.'" Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (quoting Giano v. Selsky, 37 F.Supp.2d 162, 167 (N.D.N.Y. 1999)); Joseph v. Fischer, 2009 WL 3321011, at *11 (S.D.N.Y. Oct. 8, 2009); see also Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996) (examining whether

19

confinement in SHU implicates a protected liberty interest). A prisoner's liberty interest is implicated by SHU confinement only if the discipline "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Palmer, 364 F.3d at 64 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)); see also Frazier, 81 F.3d at 317-18 (affirming dismissal of due-process claim based on twelve-day confinement in SHU). Following Sandin and Palmer, a court must look to the actual punishment in making this determination. Palmer, 364 F.3d at 64 (citing Scott v. Albury, 156 F.3d 283, 287 (2d Cir. 1998)). Factors to aid in determining whether the plaintiff endured an "atypical and significant hardship" include "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions" and "the duration of the disciplinary segregation imposed compared to discretionary confinement." Palmer, 364 F.3d at 64 (quoting Wright v. Coughlin, 132 F.3d 133, 136 (2d Cir. 1998)).

There exists no bright-line rule which establishes a length of SHU confinement beyond which a due-process right is implicated. Palmer, 364 F.3d at 64. "Where the plaintiff was confined [in SHU] for an intermediate duration - between 101 and 305 days -

'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required [to determine whether a prisoner's liberty interest was infringed]." Palmer, 364 F.3d at 64-65 (quoting Colon v. Howard, 215 F.3d 227, 232 (2d Cir. 2000)). Even when the conditions of confinement are normal SHU conditions,[6] it is possible that a longer-than-intermediate confinement may be a significant enough departure from "the ordinary incidents of prison life to require procedural due process protections under Sandin." Id. at 65 (quoting Colon, 215 F.3d at 231 (finding that 305 days of SHU confinement, under normal SHU conditions, infringed plaintiff's liberty interest)).

In the present matter, plaintiff has not alleged that the conditions of his confinement differed from normal SHU circumstances. Plaintiff simply alleges that he was sentenced to twenty-two months in SHU,[7] and actually confined in SHU for 291

---

[6] See N.Y.C.C.R.R. tit. 7, §§ 304.1-.14, 305.1-.6 (listing the "services" and "controls/restrictions/restraints" of the special housing units). Under the normal conditions of SHU confinement in New York, for example, the prisoner is entitled to: one hour of daily outdoor exercise, the same type of meals as are available to inmates in the general population and two showers per week.

[7] It is unclear whether the duration of SHU confinement imposed is relevant to the Sandin inquiry, at least where the length of actual confinement is not significantly shorter than the sentence. See Colon, 215 F.3d at 231 n. 4. Since we find that plaintiff's allegations of actual confinement are sufficient to

days. Looking to Palmer and considering plaintiff's status as a pro se litigant, we conclude that plaintiff's confinement in SHU for 291 days is sufficient, for pleading purposes, to implicate a liberty interest. See Palmer, 364 F.3d at 65; see also Colon, 215 F.3d at 231 ("There are no precise calipers to measure the severity of SHU hardship, but we believe that wherever the durational line is ultimately drawn, 305 days [of confinement in normal SHU conditions] satisfies the standard."). The length of time of plaintiff's SHU confinement and the lack of information concerning the conditions of plaintiff's confinement leave open sufficient possibility that plaintiff had a valid liberty interest. Accordingly, we now look to whether the manner in which the hearing was conducted failed to meet due-process standards. See Giano, 238 F.3d at 225.

Essential to due process is the freedom from arbitrary governmental action. Wolff v. McDonnell, 418 U.S. 539, 558 (1974). However, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Id. at 556 (citing

---

plausibly implicate a protected liberty interest, we need not consider the implications of the fact that he was sentenced to a period of confinement over twice as long as that which he actually served.

22

Morrissey v. Brewer, 408 U.S. 471, 488 (1972)). Nevertheless, certain minimum requirements of procedural due process must be applied even in the prison-disciplinary context. See generally id. at 563-72 (discussing which requirements of procedural due process were constitutionally required in the prison-disciplinary context). "Chief among the due process minima outlined in Wolff [is] the right of an inmate to call and present witnesses and documentary evidence in his defense before the disciplinary board." Ponte v. Real, 471 U.S. 491, 496 (1985). Additionally, both Wolff and Baxter v. Palmigiano, 425 U.S. 308 (1976), stated that "ordinarily the right to present evidence is basic to a fair hearing, but the inmate's right to present witnesses is necessarily circumscribed by the penological need to provide swift discipline in individual cases." Ponte, 471 U.S. at 495. The Court in Ponte emphasized that "[t]his right is additionally circumscribed by the very real

dangers in prison life which may result from violence or intimidation directed at either other inmates or staff." Ponte, 471 U.S. at 496 (quoting Baxter, 425 U.S. at 321).

The Supreme Court has consistently held that prison officials must be accorded the discretion necessary to keep a hearing within reasonable limits and to refuse to call witnesses when summoning

them may create a risk of reprisal or undermine authority. <u>Wolff</u>, 418 U.S. at 566 ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence."). Additionally, a hearing officer may deny a prisoner's request to call a witness "on the basis of irrelevance or lack of necessity." <u>Kingsley v. Bureau of Prisons</u>, 937 F.2d 26, 30 (2d Cir. 1991).

It would aid reviewing courts if prison disciplinary officers gave their reasons for denying an inmate's request for witnesses, but "nowhere in Wolff or Baxter did [the Supreme Court] require the disciplinary board to explain why it denied the prisoner's request, nor did [the Court] require that those reasons otherwise appear in the administrative record." <u>Ponte</u>, 471 U.S. at 496. Accordingly, the Court in <u>Ponte</u> refused to "prescribe" that the reasons for refusing to call a witness be stated in writing. <u>Id.</u> The Court also declined to hold that the Due Process Clause required the administrative record to include the board's justifications or reasons for denying the witness, noting that prison officials could explain their actions "by presenting testimony in court if the

deprivation of a 'liberty' interest is challenged because of the claimed defect in the hearing." Id. at 497.

In the present action we are left without any justification or reason for CHO Calero's denial of plaintiff's request for the two additional witnesses. There is no indication in the record, nor any assertion in defendant's documents, that calling Sgt. Kasper or CO Smith would have created a risk to personal safety or undermined institutional authority. Cf. Wolff, 418 U.S. at 566. Because defendants have not provided any documentation suggesting CHO Calero's reasoning for denying plaintiff's request to call Sgt. Kasper and CO Smith as witnesses, we cannot presume any valid reason, either related to personal safety, irrelevance or waste of time. See, e.g., Wolff, 418 U.S. at 566 ("Although we do not prescribe it, it would be useful for the Committee to state its reason for refusing to call a witness, whether it be for irrelevance, lack of necessity, or the hazards presented in individual cases."). The CHO was not required to explain her decision to deny plaintiff's two additional witnesses, but, without more information, defendants cannot justify a Rule 12(b)(6) dismissal for failure to state a claim. We do not believe that plaintiff has failed to state a claim upon which relief can be

25

granted. Accordingly, we must next consider defendant's qualified-
immunity theory.


A defendant may invoke a qualified-immunity defense if he can
demonstrate that his conduct did not violate "clearly established
statutory or constitutional rights of which a reasonable person
would have known" at the time of the incident. Harlow, 457 U.S. at
818 (1982); see, e.g., Blouin v. Spitzer, 356 F.3d 348, 358 (2d
Cir. 2004). The defendant will be deemed immune from liability if
he can show either (1) that his conduct did not violate the
plaintiff's "clearly established rights" or (2) that a reasonable
person in the defendant's position could have believed, in view of
all of the pertinent circumstances, that his conduct did not
violate such a right. Kerman v. City of New York, 374 F.3d 93, 108-
09 (2d Cir. 2004); accord, Amore v. Novarro, 624 F.3d 522, 530 (2d
Cir. 2010).


Typically such a defense rests on an evidentiary showing of
what the defendant did and why, see, e.g., Kerman, 374 F.3d at 109;
Hurlman v. Rice, 927 F.2d 74, 78 (2d Cir. 1991), although there may
be circumstances in which an immunity defense will be upheld based
solely on the pleadings. See Wesley v. Muhammad, 2008 WL 123812, *9

(S.D.N.Y. Jan. 10, 2008); <u>Randolph v. City of New York Dep't of Corr.</u>, 2007 WL 2660282, *12-13 (S.D.N.Y. Sept. 7, 2007). That would be the case if the defendant's conduct, as alleged by the plaintiff in his complaint, did not transgress a "clearly established statutory or constitutional right," or if the circumstances of the conduct, as alleged in the complaint, indisputably demonstrate that a reasonable state actor in the position of the defendant could have believed that his conduct was lawful. <u>See</u>, <u>e.g.</u>, <u>Harlow</u>, 457 U.S. at 818; <u>Green v. Bauvi</u>, 46 F.3d 189, 195 (2d Cir. 1995); <u>Liffiton v. Keuker</u>, 850 F.2d 73, 76 (2d Cir. 1988).

In the present case, defendant's proffered grounds for a 12(b)(6) dismissal appear to rest on the second prong of the qualified immunity test -- that a reasonable person in CHO Calero's position could have believed, in view of all of the pertinent circumstances, that his conduct did not violate plaintiff's constitutional rights. Defendants argue that "[i]t was objectively reasonable for hearing officer Calero to believe that clearly established law did not require her to call Sgt. Kasper and CO Smith as witnesses." (Defs.' Mem. of Law at 13).

Plaintiff asserts that Sgt. Kasper and CO Smith should have been allowed to testify at his disciplinary hearing. (Compl.

Addendum at p. 6, ¶ 2). Plaintiff wished to call Sgt. Kasper as a witness to question him about the fact that he was not present at the search of plaintiff's cell and therefore could not have smelled smoke, which was the asserted basis of the requested urinalysis test. (Compl. Ex. B at 3). Defendants argue that the justification for calling Sgt. Kasper is suspect "because it is not clear why he (plaintiff) believes that Kasper would testify inconsistently with his own order for a urinalysis based on detection of a smoke odor." (Defs.' Mem. of Law at 13). As a matter of pleading, there appears to have been a potential inconsistency between Sgt. Berry's testimony that Sgt. Kasper was not with him, but only in the area, and Sgt. Kasper's request for urinalysis of plaintiff based on his having smelled smoke. Given the potential for inconsistency, it is possible to infer that plaintiff had a <u>bona</u> <u>fide</u> basis for questioning Kasper, and we cannot determine at this stage what basis CHO Calero had for excluding him as a witness. In short, we cannot say as a matter of law that a reasonable CHO would have ruled as she did. Immunity is not available on a 12(b)(6) motion to defeat plaintiff's claim based on CHO Calero's denial of plaintiff's request to call Sgt. Kasper as a witness.

Plaintiff also asserts that CHO Calero improperly denied his request to call CO Smith as a witness. (<u>See</u> Compl. Addendum at p.4,

¶ 5, see also id. at p. 6. ¶ 2). Plaintiff asserts that CO Smith would have been able to offer information pertaining to the prison's razor-exchange procedures. (Compl. Addendum at p. 4, ¶ 5). We acknowledge that CO Smith was not present for, nor -- it seems -- even a participant in the events that led to plaintiff's convictions. However, plaintiff's stated purpose for calling CO Smith appears to be valid since he was charged with possession of a razor. In addition, there is nothing in the record from which we can conclude that the information about the prison's razor-exchange policy -- which plaintiff sought to elicit from CO Smith -- was introduced at plaintiff's disciplinary hearing. Accordingly, we are unable to discern from the limited record why plaintiff was not permitted to call CO Smith, and insofar as plaintiff's claims are based on that denial, defendants cannot shield CHO Calero with a qualified-immunity defense at the pleading stage.

We recommend that defendants' motion to dismiss the claims against CHO Calero be denied.

D.   The Due-Process Claim Against Director Bezio

Finally, defendants seek to dismiss plaintiff's claim against Director Bezio. (Defs.' Mem. of Law at 17-18). This application is

29

premised on the assertion that (1) plaintiff had no right to an administrative review of his disciplinary hearing, and that therefore, the facts alleged cannot sustain plaintiff's claim of a due-process violation, and (2) even if plaintiff did have a clearly established right to an appeal of his disciplinary hearing conviction, Director Bezio is entitled to qualified immunity. (Id.). We find these arguments to be unconvincing.

Defendants first claim that plaintiff had no right to an administrative review of the CHO's hearing determination, citing Hernandez v. Selsky, 2006 WL 566476, *3 (N.D.N.Y. Mar. 7, 2006), and on the basis of that contention they assert that "Director Bezio did not violate plaintiff's due process rights from the bare fact alleged that he sustained the finding of guilty." (Defs.' Mem. of Law at 18). However, defendants' reliance on Hernandez is misplaced. In that case, the plaintiff argued that he had a due-process right and/or a right "under 7 N.Y.C.R.R. § 254.8 (which sets forth the procedure for appealing a disciplinary conviction) to have a tape recording or transcript of his disciplinary hearing made and considered on administrative appeal." Hernandez, 2006 WL 566476 at *3. The Hernandez court held that the plaintiff did not have a constitutional or other right to have the administrative review officer consider the tape recording or transcript of his

30

disciplinary hearing. Id. This holding does not support defendants'
argument.

Insofar as defendants argue that plaintiff has no federal
constitutional right to administrative review of a prison
disciplinary hearing, however, they are correct. See Wolff, 418
U.S. at 563-70 (omitting right to appeal from list of minimal due
process requirements at prison disciplinary hearing); accord Sira
v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (same); Amato v. Ward, 41
N.Y.2d 469, 473, 393 N.Y.S.2d 934, 937 (1977) ("This type of
administrative review [of prison disciplinary hearings pursuant to
the N.Y.C.R.R.] is not required by the Federal Constitution.")
(citing Wolff, 418 U.S. at 565). Nevertheless, once the state has
created a right to administrative review, it cannot deprive a
prisoner of that right arbitrarily. See Wolff, 418 U.S. at 557
("[T]he State having created the right . . . and itself recognizing
that its deprivation is a sanction authorized for major misconduct,
the prisoner's interest . . . entitle[s] him to those minimum
procedures appropriate under the circumstances and required by the
Due Process Clause to insure that the state-created right is not
arbitrarily abrogated."). Therefore, once an officer has been
assigned by state law to decide an issue that may result in the

31

loss of a liberty interest,[8] that officer may, depending on how he exercises his authority, be personally involved in the deprivation of a due-process right that arises from the imposition of a disciplinary sentence of sufficient severity.

The general liberty interests of prison inmates necessarily must be limited during their incarceration, but "they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citing Wolff, 418 U.S. at 555-56). We have already concluded, as a pleading matter, that plaintiff's confinement in SHU for 291 days may have imposed an atypical hardship entitling him to appropriate due-process procedures and that he has adequately pled a possible due-process violation by virtue of the denial of two requested witnesses in a hearing that led to this suit. It thus remains for us to evaluate whether the complaint adequately pleads Director Bezio's involvement in that alleged violation, by virtue of his affirming CHO Calero's determination.

---

[8] New York has created a right for prisoners to appeal the results of prison disciplinary proceedings, and granted the prison officials who hear the appeals the power to affirm, modify, or reverse the hearing decision. 7 N.Y.C.R.R. § 254.8.

Although not explicitly stated in the papers, it appears that plaintiff seeks to recover against Director Bezio under a variant of the principle of supervisory liability. It is well settled that, regardless of a defendant's position in the governmental hierarchy, he cannot be held liable under section 1983 for an award of damages absent some form of personal involvement in the constitutional tort. Iqbal, 129 S.Ct. at 1949 ("In a § 1983 suit . . . the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).

Until recently the accepted standard for personal involvement by a supervisor was that articulated in Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). In Colon the Court identified five categories of conduct that may demonstrate the personal involvement of a supervisory defendant. Such personal involvement, the Court held, may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the

33

defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. Id.; Wright, 21 F.3d at 501; see also Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) (quoting Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).

The scope of what qualifies as "personal involvement" by a supervisor has recently come into question by virtue of the Supreme Court's 2009 decision in Iqbal, in which the Supreme Court held that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S.Ct. at 1948. The Second Circuit has not yet addressed how Iqbal affects the five categories of conduct that give rise to supervisory liability under Colon. However, because Iqbal specifically rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution," 129 S.Ct. at 1949, several decisions in this district have held that Iqbal has nullified most of the longstanding Colon factors. See Newton v. City of N.Y., 640 F.Supp.2d 426, 448 (S.D.N.Y. 2009)

34

("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in Ashcroft v. Iqbal."); Bellamy v. Mount Vernon Hosp., 2009 WL 1835939, *4 (S.D.N.Y. June 26, 2009). For example, in Bellamy, the court concluded that "[o]nly the first and part of the third Colon categories pass Iqbal's muster," and that "[t]he other Colon categories impose the exact types of supervisory liability that Iqbal eliminated," because only the first and third categories sufficiently allege personal involvement to permit supervisory liability to be imposed after Iqbal. Bellamy, 2009 WL 1835939 at *6; accord, Spear v. Hugles, 2009 WL 2176725, *2 (S.D.N.Y. July 20, 2009). Similarly, in Joseph v. Fischer, the court interpreted Iqbal to establish an act/omission dichotomy, under which section 1983 defendants are liable if their acts deprive a plaintiff of his or her constitutional rights, but not if their failures to act do so. 2009 WL 3321011, at *14.[9]

We disagree with these narrow interpretations of Iqbal, as have a number of other courts. See Qasem v. Toro, 737 F.Supp.2d

---

[9] Even if we agreed with this act/omission dichotomy, it would not necessarily weigh in favor of dismissing plaintiff's claims against Bezio. Bezio's involvement in this case could easily be seen as either an omission -- failing to overturn CHO Calero's due process violation -- or an affirmative act, upholding CHO Calero's ruling and, in part, plaintiff's SHU sentence.

147, 151-52 (S.D.N.Y. 2010) ("As <u>Iqbal</u> noted, the degree of personal involvement required to overcome a 12(b)(6) motion varies depending on the constitutional provision alleged to have been violated. Invidious discrimination claims require a showing of discriminatory purpose . . . ."); <u>D'Olimpio v. Crisafi</u>, 718 F.Supp.2d 340, 346-47 (S.D.N.Y. 2010) ("<u>Colon</u>'s bases for liability are not founded on a theory of <u>respondeat superior</u>, but rather on a recognition that 'personal involvement of defendants in alleged constitutional deprivations' can be shown by nonfeasance as well as misfeasance.") (quoting <u>Colon</u>, 58 F.3d at 873). We believe, as observed in <u>Sash v. United States</u>, 674 F.Supp.2d 531, 544 (S.D.N.Y. 2009) that "[i]t was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." <u>Id.</u> at 544 (citing <u>Iqbal</u>, 129 S.Ct. at 1949). Thus, as in the present case, where the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in <u>Colon</u> should still apply "as long as [it is] consistent with the requirements applicable to the particular constitutional provision alleged to have been violated." <u>Qasem</u>, 737 F.Supp.2d at 151-52 (citations omitted); <u>see also</u> <u>D'Olimpio</u>, 718 F.Supp.2d at 347; <u>Sash</u>, 674 F.Supp.2d at 544.

Here, plaintiff alleges violations of his right to procedural due process within the context of a prison disciplinary hearing. As stated above, this does not require the plaintiff to show that the defendants intended to deprive him of his procedural rights, but only that defendants deprived him of a liberty interest as a result of insufficient process. See, e.g., Giano, 238 F.3d at 225. This standard contains no reference to intent, or, indeed, even to the lesser "deliberate indifference" standard applied to Eighth Amendment claims for denial of medical care, under which a plaintiff must show that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quoting, inter alia, Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Looking, therefore, to Colon, we view the second category -- that "(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong," Colon, 58 F.3d at 873 -- as the most applicable for evaluating plaintiff's claim. However, the degree of the supervisor's required involvement, in learning of the violation and then failing to remedy the wrong -- which is required by the second factor -- is still not entirely clear.

37

At the outset, we must distinguish between prison disciplinary hearings and hearings on prisoner grievances. In the grievance context, the Second Circuit noted in dictum some years ago that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of." McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004) (citing Joyner v. Greiner, 195 F.Supp.2d 500, 506 (S.D.N.Y. 2002)). It then examined the circumstances of the case and held that the defendant in question (Miller) was "alleged to have had sufficient personal involvement" to remain in the case. Id. In McKenna, Miller had not only heard and rejected the plaintiff's grievance, which was predicated on an alleged denial of medical treatment, see id., but was "alleged . . . to have been responsible for the prison's medical program." Id. Hence, the Court held that he should remain in the lawsuit because, as supervisor of prison medical programs and a participant in deciding plaintiff's course of treatment, "his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility." Id. at 437-438.

In Joyner, on the other hand, the defendant in question -- Greiner -- was the superintendent of the prison, and the only allegation of his personal involvement was that he "affirmed denial

38

of a grievance against [] two doctors for failing to provide care."
Joyner, 195 F.Supp.2d 500, 506. Since "a prison administrator is
permitted to rely upon and be guided by the opinions of medical
personnel concerning the proper course of treatment administered to
prisoners, and cannot be held to have been personally involved if
he does so, id. (citing Abdush-Shahid v. Coughlin, 933 F.Supp. 168,
183 (N.D.N.Y. 1996)), the court in Joyner dismissed the claim
against Greiner "due to lack of personal involvement." Id.


    Recent cases dealing with the issue of personal liability
arising from the defendant's involvement in the prison grievance
process have struggled with the dicta left by the Circuit in
McKenna. The court in Burton v. Lynch, 664 F.Supp.2d 349, 360
(S.D.N.Y. 2009), noted the post-McKenna divisions and discussed
three factors used by other courts to determine whether a prison
official was personally involved in a cases. The first factor was
the distinction "between simply affirming the denial of a grievance
and 'review[ing] and respond[ing] to a prisoner's complaint' by
undertaking some kind of investigation," and the Burton court noted
two cases that had found liability only in the latter situation.
Id. (citing cases). Second, some courts drew a distinction "between
a pro forma denial of a grievance and a 'detailed and specific'
response to a grievance's allegations. Id. (citing Brooks v.

39

Chappius, 450 F.Supp.2d 220, 226 (W.D.N.Y. 2006)). Finally, some
courts looked to whether the "alleged constitutional violation
complained of in a grievance [was] 'ongoing' . . . such that the
'supervisory official who reviews the grievance can remedy [it]
directly,'" finding personal involvement only in cases dealing with
ongoing violations. Id. (citing Vega v. Artus, 610 F.Supp.2d 185,
198 (N.D.N.Y. 2009)). In Burton, the court used the ongoing-
violation test to evaluate the motion before it, noting that the
test "ensures that a Superintendent is not held liable for every
constitutional tort committed by a subordinate solely by virtue of
his role as the intermediate appellate level in the inmate
grievance process." Id. at 361; see also Thompson v. New York, 2001
WL 636432, at *7 (S.D.N.Y. Mar. 15, 2001)). On the other hand, in
Braxton v. Nichols, 2010 WL 101001 (S.D.N.Y. Mar. 8, 2010), the
court noted that the split within the Circuit on this point and the
corresponding "uncertainty in the law" led it to the conclusion
that the plaintiff's claims could not be dismissed as a matter of
law, and it allowed discovery to go forward to determine "whether
the members of the panel [who reviewed plaintiff's grievance] were
in a position to remedy the alleged ongoing constitutional
violation Plaintiff complains of." Id. at *9.

    In the context of prison disciplinary hearings, the Second

Circuit has, on at least one occasion, allowed a due-process claim to proceed against an upper-level prison official based on the allegation that the official "affirmed [plaintiff's disciplinary] conviction on administrative appeal." Williams v. Smith, 781 F.2d 319, 324 (2d Cir. 1986); see also Wright v. Smith, 21 F.3d 496, 502 (2d Cir. 1994) ("We conclude, therefore, that [Superintendent] Smith was 'a supervisory official who, after learning of the violation through a report or appeal, failed to remedy the wrong.'") (internal brackets omitted) (quoting Williams, 781 F.2d at 323). The Circuit's finding in Williams, however, also noted that the defendant, who was the Superintendent of Attica Correctional Facility, could easily be alleged to be involved in a "custom or policy" of allowing unconstitutional practices, "given the frequency with which Attica has violated inmates' rights to call witnesses during Smith's tenure." Williams, 781 F.2d at 324 (citing cases).

Williams and Wright do not appear, however, to have settled the issue of when, precisely, affirming the finding of a disciplinary hearing on appeal will constitute sufficient personal involvement by the appellate official. In fact, shortly after Wright was decided, the Western District of New York held that a defendant who was the Director of Special Housing and Inmate

Disciplinary Programs for DOCS -- the same position held by defendant Bezio -- "perform[ed] a quasi-judicial role as a professional civilian hearing officer," and was therefore entitled to "absolute immunity from liability based on his role in . . . Plaintiff's disciplinary hearing." Gaston v. Coughlin, 861 F.Supp. 199, 210-11 (W.D.N.Y. 1994) aff'd in part and vac'd in part on other grounds, 249 F.3d 156, 166 (2d Cir. 2001). The Second Circuit overturned this holding in Young v. Selsky, 41 F.3d 47, 54 (2d Cir. 1994), but noted that prison officials who hear administrative appeals from disciplinary hearings could assert qualified immunity, and did not clarify what allegations would be sufficient to find those officials personally involved in a violation of an inmate's rights. See id.; see also Hameed v. Mann, 57 F.3d 217, 224 (2d Cir. 1995) ("[A] prison appellate hearing officer is not entitled to absolute immunity from a claim of constitutional defects in a prison hearing proceeding, though he may be entitled to qualified immunity.").

Since then, a number of courts in this Circuit have concluded that merely affirming the hearing officer's determination is not a sufficient basis to impose liability under the second Colon factor. See, e.g., Abdur-Raheem v. Selsky, 598 F.Supp.2d 367, 370 (W.D.N.Y. 2009) ("The only allegation concerning Selsky in the case at bar is

42

that he affirmed the disposition of plaintiff's administrative
segregation hearing, pursuant to which plaintiff was confined to
SHU . . . . That is not enough to establish Selsky's personal
involvement.") (citing cases); Odom v. Calero, 2008 WL 2735868, at
*6-7 (S.D.N.Y. July 10, 2008) (holding that officials who upheld
the finding of plaintiff's disciplinary hearing on administrative
appeal "were not 'personally involved' in committing the alleged
due process violations."); Ramsey v. Goord, 2005 WL 2000144, *6
(W.D.N.Y. Aug. 15, 2005) ("the fact that Commissioner Goord and SHU
Director Selsky, as officials in the DOCS 'chain of command,'
affirmed defendant Ryerson's determination on appeal is not enough
to establish personal involvement of their part").

On the other hand, other courts have found that affirming a
hearing officer's determination on appeal is sufficient to
establish personal involvement under the second Colon factor. For
example, the court in Bennett v. Fischer, 2010 WL 5525368, *12
(N.D.N.Y. Aug. 17, 2010), held that a facility Superintendent may
have been involved in the review of a prisoner's disciplinary
appeal and that accordingly there were "material questions of fact
with regard to... [the Commissioner's] personal involvement which
preclude the entry of summary judgment." Id. Several other cases
have come to the same conclusion. See, e.g., Holmes v. Fischer, __

F.Supp.2d __, 2011 WL 486940, at *13 (W.D.N.Y. Feb. 1, 2011) (citing Chavis v. Zodlow, 128 Fed. Appx. 800, 804-05 (2d Cir. 2005)); Johnson v. Coombe, 156 F.Supp.2d 273, 278 (S.D.N.Y. 2001) ("The Second Circuit has held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allege that the superintendent was personally involved in depriving the prisoner of his due process right to call witnesses.") (citing Williams, 781 F.2d at 324); Moore v. Scully, 1993 WL 22129, at *3 (S.D.N.Y. Jan. 26, 1993); Cepeda v. Coughlin, 785 F.Supp. 385, 391 (S.D.N.Y. 1992); Smith v. Tucker, 1991 WL 211209, at *7 (S.D.N.Y. Oct. 4, 1991).

We believe that, as a matter of pleading, Director Bezio's actions, by affirming CHO Calero's determination with only a modification of the penalty,[10] are sufficient to demonstrate personal involvement and could lead a trier of fact to impose liability under the second Colon factor. See Rodriguez v. Selsky, 2010 WL 980273, *6 (N.D.N.Y. Mar. 15, 2010) ("Those cases concluding that a plaintiff's allegations that defendant [Director of Special Housing and Inmate Disciplinary Programs for DOCS] Selsky reviewed and upheld an alleged constitutionally suspect

_____

[10] "THE MISBEHAVIOR, ALTHOUGH SERIOUS, DOES NOT WARRANT THE PENALTY IMPOSED." (Compl. Ex. A).

disciplinary determination are enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consistent with the Second Circuit's position regarding personal involvement.").

Director Bezio's actions fall squarely within the second <u>Colon</u> factor -- after he learned, via an appeal, of an alleged violation of plaintiff's rights, he not only failed to remedy the wrong, but allowed it to continue. <u>Cf.</u> <u>Colon</u>, 58 F.3d at 873. The facts in the present case are analogous to those in <u>Johnson v. Coombe</u>, 156 F.Supp.2d 273, which we believe was decided correctly. In <u>Coombe</u>, the plaintiff was denied the opportunity to call two witnesses at his disciplinary hearing, "and no explanation was offered for their absence." <u>Id.</u> at 275. He was found guilty and sentenced to 715 days in SHU and the loss of twelve months of good time. <u>Id.</u> Plaintiff appealed to the superintendent of his facility (McGinnis) and to the Commissioner of DOCS; the superintendent denied his appeal, but Commissioner Coombe reduced plaintiff's time in SHU to one year. <u>Id.</u> Plaintiff filed an Article 78 proceeding, which "annulled the matter and expunged all reference to it in plaintiff's records." <u>Id.</u> (citing <u>Johnson v. Coombe</u>, 244 A.D.2d 644, 644, 664 N.Y.S.2d 372, 373 (3d Dep't 1997)). Citing <u>Williams</u>, the district court declined to dismiss the complaint as against Superintendent

McGinnis and Commissioner Coombe. Id. at 278.

Another analogous case that we believe was decided correctly is Baez v. Harris, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007). In Baez, the District Court declined to follow a Report and Recommendation suggesting dismissal of plaintiff's Fourteenth Amendment claim against defendant Donald Selsky, who held the same position within the prison system as Director Bezio. Id. at *3. Upon initial appeal, Director Selsky modified the plaintiff's punishment from twenty-four to twelve months in SHU, despite plaintiff's contention that his due-process rights had been violated at the initial hearing. Id. at *2. Only after the plaintiff's petition was transferred to the New York State Supreme Court, Appellate Division, did Director Selsky administratively reverse his earlier determination on the grounds that the hearing officer may have violated plaintiff's due-process rights by considering evidence not in the record. Id. at *4. The District Court, citing the second Colon factor, found these facts sufficient to withstand defendant Selsky's motion for summary judgment on the issue of personal involvement. Id. at *2.[11] We find the facts

---

[11] Selsky submitted an affidavit in support of summary judgment, in which he stated that he "personally responds . . . to all Tier III appeals taken by inmates." Baez, 2007 WL 446015, at *2. This obviously strengthens the argument that Selsky was personally

46

alleged in the present matter to be analogous to those in <u>Baez</u> and follow its reasoning and that of the other district courts that have held similarly. <u>See</u> <u>Holmes</u>, __ F.Supp.2d __, 2011 WL 486940, at *13; <u>D'Olimpio</u>, 2010 WL 2428128 at *4 -5; <u>see</u> <u>also</u> <u>Rodriquez</u>, 2010 WL 980273, *6; <u>Sash</u>, 674 F.Supp.2d 531. These decisions are consistent with <u>Colon</u>, which has not been altered in pertinent part in the wake of <u>Iqbal</u>. We therefore hold that the facts alleged in plaintiff's complaint against Director Bezio's may be sufficient to prove personal involvement under the second <u>Colon</u> factor.

In applying <u>Colon</u> in this manner, there is one final issue that we must address. Some courts have held that, in applying the second <u>Colon</u> category, the plaintiff must plead that there was an "ongoing" violation, which the defendant had the opportunity to "remedy." <u>See</u>, <u>e.g.</u>, <u>Odom</u>, 2008 WL 2735868, at *7 ("The reference in case law to an official who 'fails to remedy' a violation logically applies only to ongoing, and therefore correctable, constitutional violations -- not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded."). Following the

---

involved in the violation of due process in <u>Baez</u>, but we do not believe that a defendant's admission of personal involvement is necessary to survive a motion to dismiss.

language of the second Colon factor, a supervisor cannot "remedy" the violation of a constitutional right that has already ceased.[12]

At the time of plaintiff's appeal to Director Bezio, he was confined in SHU and, following his appeal, his confinement in SHU continued, resulting in a total of 291 days of confinement. (Compl. Addendum at 5 ¶2). This is sufficient to support a finding that the Thomas' appeal was meant to address an ongoing violation that could have been remedied by Director Bezio. Cf, e.g., Burton, 664 F.Supp.2d at 362-63 (finding that the situation which had given rise to plaintiff's grievance was no longer "ongoing" where plaintiff's request had been satisfied and plaintiff had been transferred to another facility before defendant superintendent received plaintiff's appeal). Thus, under the second Colon factor, we conclude that, when viewed in the light most favorable to the plaintiff, the facts pled are sufficient to withstand defendants' 12(b)(6) motion.

----

[12] "Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate," because the violation is not "ongoing and the defendant has [no] opportunity to stop the violation after being informed of it." Rahman v. Fisher, 607 F.Supp.2d 580, 585 (S.D.N.Y. 2009) (cited in Burton, 664 F.Supp.2d at 360-63).

Finally, our initial determination was that, despite Iqbal, all five Colon factors still apply to this case. However, should the Second Circuit adopt a more stringent interpretation and limit the Colon categories to include only the first and part of the third categories, we still believe plaintiff's claim survives. Plaintiff claims that by affirming CHO Calero's determination, with only a modification of the sentence, Director Bezio is responsible for the CHO's alleged constitutional violation. Looking to the first Colon category, "that the defendant participated directly in the alleged constitutional violation", we believe plaintiff has pled sufficient facts to overcome defendants' 12(b)(6) motion. Colon, 58 F.3d at 873. Accordingly, plaintiff has pled sufficient facts to state a claim against Director Bezio.

There remains only the question of whether at this stage Director Bezio is entitled to qualified immunity. The legal authority that an inmate is entitled to call witnesses was settled long before plaintiff's administrative appeal. Whether there were circumstances that justified a reasonable belief by Bezio that the denial to plaintiff of two witnesses at his disciplinary hearing satisfied due process cannot be decided on the basis of the pleadings. Hence, the immunity defense cannot be upheld on a Rule 12(b)(6) motion.

49

## CONCLUSION

For the reasons stated, we recommend that defendants' motion for dismissal be granted in part and denied in part. To the extent that plaintiff has actually made an official capacity claim, we recommend that defendant's motion to dismiss be granted. Furthermore, we recommend that plaintiff's false accusation and false testimony claims against Sgt. Berry, CO Caraballo and CO Lassiter be dismissed. Finally, we recommend that defendant's motion to dismiss the claims against CHO Calero and Director Bezio be denied.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. See also Fed. R. Civ. P. 6(a),(d). Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Laura T. Swain, Room 755, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn,

474 U.S. 140, 150-55 (1985), reh'g denied, 474 U.S. 1111 (1986);

DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000) (citing Small v.

Sec'y of Health & Human Serv., 892 F.2d 15, 16 (2d Cir. 1989)).


Dated: New York, New York
      March 17, 2011

                              Respectfully submitted,




                              _____

                              MICHAEL H. DOLINGER
                              UNITED STATES MAGISTRATE JUDGE




Copies of the foregoing Report and Recommendation have been sent
today to:

Larry Thomas
# 99-A-2559
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, NY 14411

Steven Neil Schulman
Office of the New York State Attorney General
120 Broadway
New York, NY 10271
(212) 416-8654
Fax: (212) 416-6009